UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X

VIRGINIA ROSENBERG,

                                  Plaintiff,                 **MEMORANDUM & ORDER**

           -against-                              **10 CV 2336 (DRH)(WDW)**

CHESAPEAKE PHARMACEUTICAL AND
HEALTH CARE PACKAGING, and
CHESAPEAKE PHARMACEUTICAL
PACKAGING COMPANY LLC,

                               Defendants.
-----------------------------------------------------X

APPEARANCES:

**Howard B. Leff, P.C.**
Attorney for Plaintiff
1055 Franklin Avenue, Suite 306
Garden City, New York 11530
By:     Howard B. Leff, Esq.

**Jackson Lewis, LLP**
Attorneys for Defendants
58 South Service Road, Suite 410
Melville, New York 11747
By:     Wendy J. Mellk, Esq.
             Kimberly N. Dobson, Esq.


**HURLEY, Senior District Judge:**

        Plaintiff brings this action against defendants, her former employer, alleging gender

discrimination in the workplace pursuant to Title VII of the Civil Rights Act of 1964 ("Title

VII") *as amended*, 42 U.S.C. §§ 2000e, *et seq.*, and New York Executive Law §290, *et seq.*

("NYHRL").  Before the Court is defendants' motion for summary judgment pursuant to Fed. R.

Civ. P. 56. For the reasons that follow, defendants' motion is granted.

## BACKGROUND

In 2006, Virginia Rosenberg ("plaintiff") was hired as Human Resources Manager for Arlington Press, a pharmaceutical packaging company, which was later acquired by Chesapeake Corporation and renamed Chesapeake Pharmaceutical & Health Care Packaging ("Chesapeake I"). (Defendants' Statement of Uncontested Facts Pursuant to Local Civil Rule 56.1 ("Defs.' 56.1") ¶ 2.)[1]  Plaintiff remained under Chesapeake I's employ for over three years, during which time she received regular raises and satisfactory performance reviews.  (Plaintiff's Affidavit in Opposition to Defendants' Motion ("Pl.'s Aff.") ¶ 18.)  In early 2009, Chesapeake I underwent a corporate restructuring as a result of its having declared bankruptcy, and as a result of its having been bought out by Chesapeake Pharmaceutical Packaging Company ("Chesapeake II"). (Defs.' 56.1 ¶¶ 18-19.)  Plaintiff volunteered to handle, among other things, the company's conversion to a new payroll and benefits computer system managed by ADP. (Pl.'s Aff. ¶ 24.)

Following this period of transition, plaintiff was informed that her position had been eliminated and that a "newly expanded" human resources position had been created for which she would not be considered.  (Pl.'s Aff. ¶¶ 37-38; Defs.' 56.1 ¶ 61.) Chesapeake II, allegedly unhappy with plaintiff's performance during the transition, terminated plaintiff and hired Christopher Mathews ("Mathews")[2]—a male from outside the company—to fill the position. (Pl.'s Aff. ¶ 43; Defs.' 56.1 ¶ 60.)

---

[1] Plaintiff did not provide the Court with a proper response to defendants' Rule 56.1 statement in the format required by Local Civil Rule 56.1(b) and Individual Rule 3K.  Further, although plaintiff's Rule 56.1 response cites to a corresponding paragraph or paragraphs in plaintiff's affidavit, those cited paragraphs in the affidavit rarely cite to admissible evidence in support of the assertions made therein.  Plaintiff's memorandum of law in opposition to the motion is equally light on references to the relevant evidence in the record.  The Court will disregard statements in plaintiff's affidavit that are not based on personal knowledge, contain inadmissible hearsay or make generalized and/or conclusory statements. *See Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999).  Further, as plaintiff did not provide a properly formatted fact statement, the Court will cite solely to the relevant portions of defendants Rule 56.1 statement, which, unless otherwise noted, are undisputed by plaintiff.

[2] The parties differ as to the spelling of Mathews's last name.  The Court will follow the spelling used by defendants, which matches the spelling on Mathews's resume.

Plaintiff alleges that Mathews is "less experienced, less educated and [] less qualified" for a position that entailed "the exact same duties [plaintiff] was performing at the time of [her] termination." (Pl.'s Aff. ¶¶ 47, 51.)

## I.   PLAINTIFF'S QUALIFICATIONS AND RESPONSIBILITIES AT CHESAPEAKE I

In 2006, Robin Henfling ("Henfling"), the President of Chesapeake I, hired plaintiff for the Human Resources Manager position at Chesapeake I's operating plant in Lake Success, New York ("Long Island office").[3]  (Defs.' 56.1 ¶¶ 3, 5.) At the time of plaintiff was hired, Chesapeake I also maintained plants in Lexington and Raleigh, North Carolina, with its corporate headquarters located in Richmond, Virginia.  (*Id.* ¶ 5.)

### a.   Plaintiff's Qualifications and Credentials

Plaintiff has a Bachelor's Degree in Psychology from Montclair State University and a Master's Degree in Applied Psychology from Stevens Institute of Technology. (Pl.'s Aff.  ¶ 4.) In 2002, Plaintiff obtained her Senior Professional Human Resources (SPHR) Certification from the Society of Human Resources Management. (*Id.* ¶ 5.) Plaintiff had approximately ten years of experience working in various human resources positions prior to her position with Defendants. (*Id.* ¶ 6.)  In a majority of these positions, plaintiff was responsible for administering and overseeing payroll and benefits for company employees. (*Id.* ¶ 8.)

### b.   Plaintiff's Responsibilities at Chesapeake I

In her role as Human Resources Manager, plaintiff had numerous responsibilities including, but not limited to, designing and implementing policies and procedures relating to human resources, recruiting and interviewing prospective employees, assuring company

---

[3] Defendants' Lake Success location was later moved to Hicksville, New York. (Defs.' 56.1 ¶ 6.)  Hereinafter, these two offices will be collectively referred to as the "Long Island office."

compliance with Equal Employment Opportunity standards, investigating workplace accidents, assisting with union contracts and negotiations, and performing anti-harassment training for management. (Pl.'s Aff. ¶¶ 12-16.)  Additionally, plaintiff counts among her responsibilities "act[ing] as a liaison between the Long Island office and Chesapeake Headquarters with regard to benefit programs."  (*Id.* ¶ 13.)  Among the "essential accountabilities" listed in plaintiff's job description is the administration of benefit programs provided to employees as well as "wage and salary administration and data input." (Job Description, Pl.'s Ex. C.)  However, despite its inclusion in her job description, plaintiff did not actually administer benefits or handle payroll for Chesapeake I – a fact that neither party disputes. (Defs.' 56.1 ¶ 22.)  In fact, defendants assert that one of their corporate employees in Richmond, Virginia, Janet Whitley, was responsible for administering Chesapeake I's benefits and for handling payroll for all of the company's locations. (Def. 56.1 ¶ 15.)

Plaintiff received a number of positive performance reviews, (*see* Pl.'s Aff. ¶ 18; Pl.'s Ex. E), as well as several raises during her tenure at Chesapeake I, (Pl.'s Aff. ¶ 18; Pl.'s Ex. F). It is plaintiff's belief that she had a good relationship with all of her supervisors, including Henfling. (Pl.'s Aff. ¶ 17.)

### c. Plaintiff's Involvement in the Corporate Restructuring and Transition from Chesapeake I to Chesapeake II

In December 2008, Chesapeake I declared bankruptcy. (Defs.' 56.1 ¶ 18.)  On May 1, 2009, Chesapeake Pharmaceutical Packaging Company ("Chesapeake II") purchased Chesapeake I's assets as well as its brand name, prompting Chesapeake I to terminate all of its employees, including plaintiff. (*Id.* ¶ 19.)  On May 1, 2009, Chesapeake II subsequently hired back plaintiff in addition to other former Chesapeake I employees. (*Id.*)  Henfling, who became

President of Chesapeake II, was responsible for the entirety of the corporate restructuring and transition. (*Id.*¶¶ 19, 23.)

As part of this restructuring, Chesapeake II began looking into administering its own benefits and payroll at its Long Island office, rather than at the Chesapeake Headquarters in Richmond. (*Id.* ¶ 24.)  Given her experience in handling benefits and payroll at other companies, and recognizing Chesapeake II's need for transitional help in converting to new payroll and benefits systems, plaintiff volunteered to handle this aspect of the transition. (Pl.'s Aff. ¶¶ 22-24.)  She further volunteered to manage the payroll and benefits going forward as part of Chesapeake II's operations. (*Id.* ¶ 24.) Although neither party disputes that plaintiff was to have a "substantial role" in the conversion process, (*id.* ¶ 26), the parties appear to disagree as to the extent to which plaintiff was expected to take a leadership role in said process.[4]

Defendants maintain that plaintiff performed poorly during the transition from Chesapeake I to Chesapeake II and that, during the transition, Henfling found plaintiff "to be disorganized, not attentive to details and[] incapable of managing the project." (Defs.' 56.1 ¶ 40 (citing Henfling Dep. 70-71).)  Defendants contend that, as a result, Henfling had to become "intimately involved in the minutiae of the payroll and benefits conversion project, performing tasks that plaintiff was expected to have handled in an organized fashion." (*Id.* at ¶ 52.)  Specifically, defendants blame plaintiff for a number of alleged blunders, including mixing up the dates for meetings between benefit vendors and Chesapeake employees,[5] (*id.* at ¶¶ 45-46), failing to compile necessary forms (such as the W-4, I-9, and benefit-enrollment documents) into

---

[4] Defendants contend that "Mr. Henfling expected that plaintiff would assume leadership and take control of the payroll and benefits conversion project," (Defs.' 56.1 ¶ 27.); plaintiff purportedly understood her role as one of "assist[ing] the company to transition from one system of payroll and benefits to the next system," as part of a "group effort" in which she "was one of many employees, including members of upper management, who were working on these transitions," (Pl.'s Aff. ¶ 26).

[5] Plaintiff denies that this "mix up" even occurred and argues "that it was the vendor who had made [the] mistake." (Pl.'s Aff. ¶¶ 40-41.)

organized packages to be distributed to employees which would have allowed Chesapeake to capture necessary data in an ordered fashion, (*id.* at ¶ 55), and committing a number of errors on a spreadsheet containing 401(k) deduction data, (*id.* at ¶ 52). Plaintiff contends that, "until May 7, 2009, [she] never received any criticism, complaints and/or concerns regarding [her] work performance while . . . employed by the Defendants." (Pl.'s Aff. ¶ 29.)

### d. Plaintiff's Termination

On May 7, 2009, Plaintiff was invited to lunch by Mr. John McKeough ("McKeough"), defendants' Vice President of Operations. (Pl.'s Aff. ¶ 30.) During this lunch meeting, McKeough informed plaintiff that Henfling "wasn't feeling confident in [plaintiff's] abilities." (*Id.* at ¶ 31.) However, plaintiff contends that the only specific criticism McKeough was able to provide was that plaintiff had a "messy" desk. (*Id.* at ¶ 32.) McKeough then offered plaintiff two options: she could either proceed with the same job she had been performing since February with a "written warning" in her file, or she could accept an undefined severance package.[6] (*Id.* at ¶ 33.) Plaintiff subsequently informed McKeough that she would prefer to stay with the company. (*Id.* at ¶ 36.) Days later, however, plaintiff was informed that, as a result of the creation of a "newly expanded" Human Resources position, plaintiff's position had been eliminated and, as a result, the offer to stay on the job with a written warning had been rescinded. (Pl.'s Aff. ¶¶ 37-38; Defs.' 56.1 ¶¶ 61-62.) Plaintiff's last day of work was June 30, 2009. (Pl.'s Aff. ¶ 39.)

---

[6] Defendants state that although Henfling knew that McKeough was taking plaintiff to lunch to discuss the termination of plaintiff's employment, "he was unaware that McKeough told Plaintiff that she would be able to remain 'with a written warning in her file.'" (Defs.' 56.1 ¶ 68.)

II.     MATHEWS'S QUALIFICATIONS AND RESPONSIBILITIES AT CHESAPEAKE II

   a.   **Mathews's Qualifications and Credentials**

   Mathews began working for Chesapeake II as the "Human Resources and Benefits

Manager, North America" on July 6, 2009. (Defs.' 56.1 ¶ 80.)  He has been employed with

Defendants ever since.

   Mathews earned a Bachelor's Degree in Business Management from Johnson and Wales

University in 2004. (*Id.* at ¶ 74; Mathews Resume, Pl.'s Ex. K.)  In his most recent position,

which he held for four years, Mathews was "responsible for managing human resources for

approximately 500 employees at eight sites throughout the Country." (Defs.' 56.1 ¶ 73.)  In other

prior positions, Mathews dealt with union-related issues, had multi-site responsibilities,

supervised other human-resource employees, and handled a payroll and benefits transition to an

ADP/HRB system – the new system to which Chesapeake II had just transitioned at the time of

his hire. (*Id.* at ¶ 78.)  Mathews does not have a certificate from SPHR.  (*Id.* at ¶ 79.)

   b.   **Mathews's Position at Chesapeake II**

   The Human Resources and Benefits Manager  position is described as one which

"provides leadership and direction to Chesapeake North American operations," and acts "as a

strategic partner to the Senior Management Team and [is] responsible for managing and leading

the Human Resources and Administrative functions." (*See* Job Description, Pl.'s Ex. M.)

According to defendants, Mathews's overall responsibilities include "manag[ing] and

oversee[ing] human resources for the New York, Lexington and Raleigh facilities,"

"administer[ing] benefits for all three facilities including rolling-out and negotiating the benefit

plans," and acting as "the human resources liaison with Chesapeake II's European corporate

parent." (Defs.' 56.1 ¶ 81.)  Additionally, Mathews is responsible for managing three employees,

including Melanie Crook ("Crook"), who is the Human Resources Manager for the Raleigh and Lexington locations. (*Id.* ¶¶ 8, 82.)

## DISCUSSION

### I. STANDARD OF REVIEW

Summary judgment should be granted where the pleadings and admissible evidence offered to the Court demonstrate "no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56; *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). Further, the relevant governing law determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Accordingly, where the undisputed facts demonstrate the union of all the required elements of a cause of action and no reasonable juror could find otherwise, the plaintiff is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case.").

A party may defeat a motion for summary judgment only "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element at trial." *Roe*, 542 F.3d at 36 (quoting *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 100 (2d Cir. 1998)). The non-movant must advance more "than a

scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory statements in affidavits or allegations in the pleadings are insufficient to defeat a motion for summary judgment. *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).

## II.    GENDER DISCRIMINATION UNDER TITLE VII AND NYHRL

Plaintiff alleges that defendants discriminated against her based on her in violation of both Title VII and New York Human Rights Law. Title VII of the Civil Rights Act of 1964 provides in pertinent part:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e-2(a).

Discrimination claims brought under the NYHRL are analyzed under the same standards applied to Title VII claims. *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010).

### a.  Burden Shifting Framework

In *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 802-804 (1973), the Supreme Court first enunciated the now-familiar "burden-shifting" formula used in analyzing Title VII employment discrimination claims based on indirect or circumstantial evidence. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003). This standard was further refined in *Texas*

*Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-511 (1993).

Under *McDonnell-Douglas* and its innumerable progeny, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell-Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of "discrimination *vel non*," and thus (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* (internal quotes omitted).

The burden of establishing a prima facie case of employment discrimination has been described as "modest," *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994), or even "minimal," *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves*, 530 U.S. at 143.

Likewise, the employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp. 2d 100, 111 (W.D.N.Y. 2002) (citing, *inter alia*, *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985)), *aff'd*, 99 Fed. App'x. 350 (2d Cir. June 9, 2004) (Summary Order). Federal courts do not have a "roving commission to review business

10

judgments," *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n. 8 (7th Cir. 1987)), and may not "sit as super personnel departments, assessing the merits – or even the rationality – of employers' non-discriminatory business decisions." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991). Thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

In order to demonstrate that the employer's stated non-discriminatory reasons for the allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)(internal quotes omitted). However, to rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri*, 759 F.2d at 998.

### b. *Prima Facie* Case

To establish a *prima facie* case of discrimination, a plaintiff must show that: (1) she belonged to a protected class, (2) was qualified for the position she held or sought, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent. *Terry*, 336 F.3d at 138. Defendants do not dispute that plaintiff has met

her burden on the first three of these elements, but argue that she has failed to do so on the last. (Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs.' Br.") at 6.)

### i. Inference of Discrimination

Plaintiff argues that she has established an inference of gender discrimination by showing that just weeks after the decision to terminate her, plaintiff was replaced by a male. (Memorandum of Law in Opposition to the Defendants' Motion for Summary Judgment ("Pl.'s Opp.") at 12-14.) The Second Circuit has held that "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage." *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001). Plaintiff identifies Mathews as her purported replacement. The question arising here, however, is whether the evidence demonstrates that Mathews actually "replaced" plaintiff, *i.e.* whether he was hired for the same position from which plaintiff was terminated.

Defendants argue that Mathews was hired for a new position with expanded responsibilities, such as the administration of benefits, the supervision of other human resources employees, and direct liaison responsibilities with the corporate parent in Europe. (*See* Defs.' Br. at 19-20.) Plaintiff on the other hand argues that she was indeed "replaced" by Mathews, suggesting that the responsibilities of Mathews's position entail "the same exact duties [] Plaintiff was performing at the time of her termination. " (Pl.'s Opp. at 13 (citing Pl.'s Exs. L & M).) Plaintiff concedes that Mathews now handles benefits and that she never did, but nevertheless asserts that she was told by the defendants that she too would take on that responsibility once the benefits conversion process was complete. (*Id.*)

This issue presents a close question.  While Mathews's position does appear to encompass more responsibilities than plaintiff's, it is not disputed that Mathews handles all of the responsibilities that plaintiff previously covered, and that no other individual was hired to take on the former duties of plaintiff for Chesapeake II, besides Mathews.  Nevertheless, the Court need not wade too far into this question to resolve the larger matter before it.  Instead, for present purposes, it will be assumed that plaintiff was replaced by Mathews, and therefore that plaintiff has established her "minimal" *prima facie* burden to establish an inference of discrimination. *Accord De Silva v. New York City Transit Auth.*, 1999 U.S. Dist. LEXIS 19998 (E.D.N.Y. 1999) (assuming at the *prima facie* stage that plaintiffs were "replaced" for purposes of ruling on a charge for discriminatory transfer or demotion); *see also Hanna v. Infotech Contract Servs.*, 2003 U.S. Dist. LEXIS 7056 at *18 (D. Conn. Apr. 21, 2003)(finding that plaintiff had established the fourth element of his *prima facie* case where "[a]lthough [the employer] did not hire someone to replace [the plaintiff], at least one employee who was not in [plaintiff's] protected class did assume many of his responsibilities").

### c.  Defendants' Legitimate, Nondiscriminatory Rationale

Defendants assert that plaintiff was terminated and passed over for the newly expanded position not because of her gender, but because she "was unable to successfully handle the tasks associated with the conversion project." (Defs.' Br. at 14.)  Defendants point to a number of incidents which purportedly caused them to conclude that plaintiff had fallen short of expectations.  Some of these incidents required Henfling and other members of senior management themselves to step in and manage certain aspects of the benefits and payroll conversion that plaintiff allegedly should have handled herself.

First, defendants note, the entire conversion process was to be completed by April 1, 2009; it was not.  Defendants, however, do not explicitly attribute this missed deadline to plaintiff. (*See* Henfling Dep. at 165.)  Second, plaintiff apparently mixed up the dates and locations for the open enrollment meetings where employees have the opportunity to meet representatives from various benefits vendors. (Henfling Dep. 161-62.) To ensure that vendors did not appear at the wrong place for these meetings, Henfling himself had to prepare a spreadsheet containing vendors with the corresponding dates, times and locations for their respective meetings. (*Id.* ¶ 159-60.) Third, David Knoch, a member of IPC, a private equity firm and part owner of Chesapeake II, contacted Henfling by email to state that he needed plaintiff "to be a little bit bolder . . . on the open enrollment execution," suggesting that she keep a detailed list of which vendors were coming with the relevant contact information. (Email dated 3/25/09 from David Knoch, Defs.' Ex. F.) He also suggested that she compile a checklist of all necessary documents, and that she should not be "bashful" in calling meetings with the benefits vendors. (*Id.*)  Henfling responded, suggesting that plaintiff "need[ed] a little coaching." (Henfling Dep. 222.)

Henfling also found a number of errors in a spreadsheet prepared by plaintiff that contained all of the employees "401(k) deduction data" that was to be entered into the new payroll system. (Defs.' 56.1 ¶ 52.) Among these errors were incorrect deductions from Henflings own paycheck.  Henfling voiced his concerns about the errors in this spreadsheet by responding to an email chain between Henfling, plaintiff and other employees. (4/21/09 Email Exchange, Pl.'s Ex. 8 (attached to Defs.' Mot. as Ex. D).) Therein, he asked that the spreadsheet be redone. Plaintiff responded by stating that the errors had already been "shaken out" by the vendor, and that she had already faxed the necessary corrections to another human resources representative

for correction.  She also stated that the error on Henflings own personnel record was the result of a "typo" that occurred on the record for one other employee as well. (*Id.*)  However, when Henfling followed up by asking if the vendor had checked the spreadsheet entries against the "election" forms from each employee, plaintiff admitted that the vendor had not, and volunteered to do so as soon as these forms were "uploaded." (*Id.*)

Plaintiff also failed to compile and distribute human resources information letters and forms to the local employees in a single package, which Henfling had previously suggested that she do. (Henfling Dep. 106-08.)  Compiling these items into one package would have made it quicker and easier for the employees to fill out, and for human resources to enter into the new payroll system.  Henfling discovered that plaintiff had not taken this more ordered path when he entered her office one day to find the completed employee forms separated and "very unorganized" on her desk. (Henfling Dep. 110.) When asked why she did not compile the forms and distribute them in a single, orderly package, plaintiff purportedly responded that "she wanted to do it piecemeal." (*Id.*)  Henfling testified that had they left these forms in such disarray, they would have incurred significant delays entering the data into the computer.  Considering that the company was fast approaching the deadline to switch hundreds of Chesapeake II employees over to the new payroll system, such delays were not an option.  As a result, Henfling and other employees had to spend time reorganize plaintiff's files. (*Id.* 111-12.)

Following these missteps by plaintiff, Henfling, on May 7, 2009, emailed another senior employee, Valerie Schmitt, the following:

> I believe you know with Richmond gone we have taken on more duties locally[, i.e.] HR/payroll system, pension, health [insurance], etc.
> We knew this would put a strain on the local resources, in particular Virginia Rosenberg.  We addressed this with her before the sale acknowledging the need for her to step up to the new

demands. Unfortunately, transition to this new platform has been a difficult one and at this time we do not believe Virginia can support us going forward.

Tomorrow we hope to have this sorted out. She may be added to the release list.

(Email dated 5/7/09, Defs.' Ex. H.)

### d.  Pretext

Plaintiff naturally argues that defendants' claim that she was terminated due to poor work performance is pretext for gender discrimination, and that defendants are not entitled to judgment as a matter of law.  Each of plaintiff's arguments regarding pretext are examined below.

### i.  *Plaintiff's Direct Response to Defendants' Proffered Rationale*

Plaintiff first attempts to attack the credibility of defendants' asserted reasons for her termination.  For example, she states in her affidavit that the allegation that she "mixed up" the dates for the open enrollment meetings between benefits vendors and employees "is absolutely untrue." (Pl.'s Aff. ¶ 40.)  According to plaintiff, she had sent out the proper information on time and to the proper people, but it was the vendor who had made a mistake regarding the proper date and time.  McKeough also apparently concluded that the "mix up" was not her fault.  Plaintiff fails to provide anything beyond these unsupported statements in her affidavit to advance this assertion.  Nevertheless, part of the complaint regarding plaintiff's role in the "mix up" was not so much about who sent what information to whom, or who was ultimately to blame.  The heart of the criticism went towards plaintiff's organizational skills in setting up these meetings.  As the email from David Knoch indicates, the problem was that plaintiff did not have a list of "open issues" regarding that project or a list of the related logistical details, such as the names of the representatives from each vendor, with contact information.  Regardless of whether the "mix up" was ultimately her fault, plaintiff does not dispute that Henfling ended up

16

compiling his own spreadsheet with the data that Knoch's email suggests plaintiff should have compiled herself.

Regarding the 401(k) spreadsheet, plaintiff suggests in her affidavit that this and other spreadsheets "were developed by numerous individuals, including [herself], and included information from a number of different internal sources." (Pl.'s Aff. ¶ 27.)  Careful to keep her statements in the conditional, plaintiff states that "[o]ne might begin to draft a spreadsheet, another might continue it, while a third would complete it." (*Id.*)  Regardless of how the 401(k) spreadsheet in particular may or may not have been handled—and, notably, plaintiff's affidavit does not specify—it is not disputed that plaintiff was the one who handed the spreadsheet over to Henfling and other staff.  Moreover, Henfling's complaint was that plaintiff did not check the accuracy of the data against the employee election forms.  The fact that so many people "might" contribute to the creation of the spreadsheet's creation, as plaintiff suggests, is even more reason for such error checking to be performed.  Plaintiff failed to do so before passing the document on to others, including the vendor for entry into the payroll system. (*See* 4/21/09 Email Exchange.)

Importantly, defendants' broader complaint about plaintiff's work was that she had failed to "step up to the new demands" before her. (5/7/09 Email, Defs.' Ex. H.)  Plaintiff's arguments regarding her handling of the 401(k) spreadsheet therefore fail to address defendants' underlying concerns over the issue, and, more importantly, fail to demonstrate a material issue of fact as to whether these stated concerns amounted to pretext for gender discrimination.

> ii.  *Plaintiff's Arguments Regarding the Sufficiency of Evidence of her Poor Work Performance*

Plaintiff cites to a handful of cases in which triable issues of fact were found where the record reflected evidence of positive prior job performance reviews for the plaintiff, but lacked evidence of poor work performance. (*See* Pl.'s Opp at 16 (citing *inter alia Zimmerman*, 251 F.3d

376; *Klings v. N.Y. State Office of Court Admin.*, 2010 U.S. Dist. LEXIS 33434 (E.D.N.Y. Apr. 5, 2010); and *Morris v. N.Y. City Dep't of Sanitation*, 2003 U.S. Dist. LEXIS 5146 (S.D.N.Y. Mar. 31, 2003));[7] *see also Reeves,* 530 U.S. at 148 (A plaintiff may overcome a motion for summary judgment where its "*prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

In the first of these cases cited by plaintiff, *Zimmerman*, 251 F.3d 376, the Second Circuit found plaintiff's evidence of discrimination beyond the *prima facie* case to be "slight," *id.* at 382, but nevertheless found that the evidence that the defendants' proffered reason for plaintiff's discharge was false to be "extremely substantial." *Id.* There, the Circuit stated that "[t]o the extent that the Defendant proffered [plaintiff's] alleged poor performance as the reason for her discharge, she provided ample evidence of good performance and the complete absence of any negative evaluations." *Id.* at 382-83.

Similarly, in *Klings*, 2010 U.S. Dist. LEXIS 33434, the record contained a number of positive written reviews of plaintiff's work performance, but the only evidence of her poor performance was proffered in the form of affidavits and testimony taken after the case was filed. This "stark disparity between [the] complimentary written performance evaluations, and the criticisms now being asserted, coupled with [plaintiff's] sworn denial that she was orally counseled about those criticisms, creates a genuine issue of fact for the jury's determination." *Id.* at *43-*44.

Finally, in *Morris*, 2003 U.S. Dist. LEXIS 5146, defendants' asserted legitimate rationale for the plaintiff's adverse action was that he was an "inefficient manager whose style was not

---

[7] Plaintiff also cites *to McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211 (2d Cir. 2006). (*See* Pl.'s Opp. at 16-17.) However, a comparison of the actual facts of that case to plaintiff's erroneous recitation thereof, suggests that plaintiff intended to cite to *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93 (2d Cir. 2001).

compatible with the [employer's] requirements," *id.* at *29.   The court denied the defendants' summary judgment motion because the plaintiff's personnel record consisted entirely of "performance evaluations that were always above a rating of 'good' as well as various commendations for his work." *Id.*  The *Morris* court stated that "[a]ctions taken by an employer that disadvantage an employee for no logical reason constitute strong evidence of an intent to discriminate." *Id.* (citing *Stratton v. Dep't for the Aging for the City of N.Y.*, 132 F.3d 869, 879 n.6 (2d Cir. 1997)).

Plaintiff argues that the same issue is present here.  Specifically, she argues that "[t]hroughout her employment, the Plaintiff received positive performance evaluations and raises.  Indeed, her work performance was never criticized, complained of, nor was a concern ever expressed to her about said work performance." (Pl.'s Opp. at 19.)  However, each of the cases cited by plaintiff, and recounted above, are distinguishable from the present situation.  In those cases, there was no contemporaneous record of any poor performance by plaintiff on the job. Here there is.  Although plaintiff focuses her argument on the fact that her formal, written performance evaluations were all positive, the record clearly contains other written evidence that she did not meet the expectations of her job during the transition period.  The most prominent example is Henfling's May 7, 2009 email, excerpted above, in which he explicitly expresses his concern that plaintiff does not have the ability to perform the additional human resources duties that the Long Island office would take on after the transition – the same duties that are now a part of Mathews's position.  Also, plaintiff's lack of organization pertaining to the open enrollment meetings between benefits vendors and company employees is documented in the email to Henfling from David Knoch.  Finally, her lack of thoroughness and follow-through regarding the

401(k) deduction spreadsheets are documented in email exchanges between Henfling and plaintiff herself.

More to the point, perhaps, and to draw a further distinction from the cited cases above, summary judgment in those actions was inappropriate because the positive performance reviews stood in stark contrast to the defendants' subsequent testimony that the plaintiffs had failed to exceed at their jobs. Here, plaintiff's performance reviews are unquestionably positive, and they are accordingly followed with regular salary raises. But these reviews pertain to plaintiff's performance before she took on the added tasks involved with the conversion to the new benefits and payroll system. Defendants' dissatisfaction with plaintiff's performance was not related to her ability to perform the duties of her original position, but to her ability to perform her newer duties. Plaintiff's performance reviews therefore do not conflict with defendants' evidence that plaintiff did not satisfactorily execute her responsibilities on the job during the transition period.

This evidence identifies a number of events that caused the defendants to question whether plaintiff would be able to take on the added demands of the job after the transition to Chesapeake II was complete. These concerns were expressed by defendants at the time they occurred and before the decision was made to terminate plaintiff. Plaintiff's argument that she was unaware of these criticisms does not advance her claims, as "the fact that an employee was unaware of her employer's dissatisfaction is irrelevant to a court's inquiry on the issue." *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 310-11 (S.D.N.Y. 2000). Her argument here is also contradicted by the record. Though she insists that she "was never even spoken to regarding her work performance" until her May 7, 2009 lunch with McKeough, her own emails and deposition testimony reflect that she was aware of the open enrollment and 401(k) problems during the prior

month.[8]   In the end, plaintiff has failed to offer sufficient evidence upon which a reasonable jury could conclude that defendants' legitimate, nondiscriminatory reason for her termination was pretext for gender discrimination.

### iii.   Plaintiff's Qualifications and Credentials

Plaintiff also argues that Mathews, her purported replacement, "had far less human resources experience and education" than she did. (Pl.'s Aff. ¶ 43.)  Specifically, plaintiff notes that Mathews did not possess a Senior Professional Human Resources Certificate, which plaintiff held, and that unlike plaintiff, he does not have a master's degree. (*Id.*¶ 44; Mathews's Resume, Pl.'s Ex. K.)  Defendants respond that despite his lack of a master's degree or a professional human resources certificate, Mathews was nonetheless well qualified for the position that he assumed.  He came to the company with "numerous" years of experience in human resources at other companies "handling human resource functions for approximately 500 employees at over 8 sites." (Defs.' Br. at 21 (citing Defs.' 56.1 ¶ 73).) Mathews also had experience handling the transition to an "ADP/HRB" system for payroll and benefits, which defendants had just converted to, and had "multi-site responsibilities and supervisory responsibilities for at least 6 human resource employees."  (Defs.' Br. at 21 (citing Defs.' 56.1 ¶ 78).)  Plaintiff did not have this same supervisory experience.

"Evidence indicating that an employer misjudged an employee's performance or qualifications is . . . relevant to the question whether its stated reason is pretext masking prohibited discrimination." *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

---

[8] Plaintiff asserts that the only problem with her job performance that McKeough articulated at that lunch was that Henfling thought she had a "messy" desk. (Pl.'s Aff. ¶ 32.) It is not entirely clear, but this is likely a reference to Henfling's observation that her desk was covered in employee election forms that were not organized in a manner suitable for entry into the new system.  As is clear from the discussion above regarding this incident, plaintiff was aware of the problem with these enrollment forms long before she had lunch with McKeough.

However, the Second Circuit has imposed a heavy burden on plaintiffs who advance such an argument.

> When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination.  In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Deines v. Tex. Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 280-81 (5th Cir. 1999); *see also Fischbach*, 86 F.3d at 1183 ("Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates.")

*Byrnie*, 243 F.3d at 103.

Here, plaintiff's qualifications alone, relative to Mathews do not satisfy this burden, particularly when one takes into account the evidence of her performance during the transition period.  Simply put, no reasonable jury could conclude based on the qualifications of these two employees as they appear on paper that Mathews was not suited for the position, or that Henfling was unreasonable in hiring Mathews over plaintiff. *See id.*  Not only did Mathews's have extensive experience specific to human resources, much of this experience was on the same benefits and payroll platform that Chesapeake II now uses, and much of this experience was in a supervisory role with multiple sites.  Plaintiff has therefore failed to demonstrate a triable issue of fact regarding the relative qualifications of plaintiff and Mathews.

### iv.   Other Alleged Inferences of Discrimination Raised by Plaintiff

Although not addressed in her memorandum of law, plaintiff's affidavit contains references to facts that she asserts lend "support[]" to her claims of discrimination by, *inter alia*, demonstrating a pattern and practice of discrimination. (*See* Pl.'s Aff. ¶¶ 50-58.)

First, plaintiff points out that although Mathews earned less than plaintiff did, he nonetheless earns more than the other human resources manager, Melanie Crook, who, as plaintiff suggests, has more experience than Mathews.  The Court dispenses with this argument by first noting that any inference of discrimination that this discrepancy might create is immediately undermined by the concession that plaintiff, herself a woman, was paid more than Mathews.  Moreover, plaintiff provides no evidence that Crook was paid less than Mathews, or any explanation as to how Crook is more qualified.

Second, plaintiff suggests that Henfling and Yves Regnier, the company's Finance Director, "treated and spoke to women differently than men," and held different expectations for women than they did for women.  Nothing further is offered in support of these purely conclusory statements, which will accordingly be disregarded by the Court.  Equally conclusory and unavailing is plaintiff's claim that two unidentified men, that plaintiff was involved in hiring for two unspecified positions within the company, were paid more than "other females" who, for reasons not articulated, were more qualified. (Pl.'s Aff. ¶ 56.)  After plaintiff provided the names of these two previously unidentified men, and the name of one of these "other females," defendants obtained their salary information and proffered evidence that the female employee identified by plaintiff was actually paid more than the two men. (*See* Defs.' Reply at 3 (citing Mathews Aff. ¶ 14).)

Third, in a further effort to demonstrate a pattern of disparate treatment by defendants, plaintiff claims that Ro Torrisi, the Vice-President of Customer Relations and the only female in senior management, was paid less than the men in senior management. (Pl.'s Aff. ¶ 57.) Plaintiff, however, offers no documentation of this alleged fact, which is countered by defendants' evidence that the company's new Finance Director for North America, a woman, is

23

the third-highest paid employee in the entire company, behind Henfling and the Vice President for Sales and Marketing. (Mathews Aff. ¶ 15.)  Further, even crediting that Torrisi was the only female in senior management, and that she was paid less than her male counterparts, this fact does not amount to a pattern of gender discrimination in a company with hundreds of employees.

Finally, plaintiff claims that an "overwhelming number" of those laid off in June 2009[9] were female. (Pl.'s Aff. ¶ 58.)  Plaintiff offers in support the names of six people who were let go during this time period, five of whom are female. (Pl.'s Ex. N.)  However, defendants have submitted evidence that a total of 25 employees, not six, were laid off as a result of the company's transition from Chesapeake I to Chesapeake II. (Mathews Aff. ¶ 12 and Ex. A thereto.)  The complete list of all those laid off contains the same six individuals identified by plaintiff plus 19 more. (*Id.*) Of these 25 individuals only six, or less than a quarter, were women. (*Id.*)

In sum, plaintiff has failed to set forth evidence that defendants engaged in a pattern or practice of discrimination, and further failed to demonstrated that the proffered rationale for her termination was pretext for gender discrimination.

---

[9] As defendants note in their reply memorandum, although plaintiff references the layoffs of "June 2011" in her affidavit, it can be assumed that she is actually referring to the layoffs in June 2009.  Notably, the face of the documentary evidence that plaintiff cites to in support (namely, a list of those terminated) indicates that it was marked as an exhibit during Henfling's deposition which occurred on May 5, 2011. (*See* Pl.'s Ex. N.)

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted and

plaintiff's complaint is dismissed.  The Clerk of Court shall close this case.

SO ORDERED.


Dated:  Central Islip, New York
         August 27, 2012                                    _____/s_____
                                                            Denis R. Hurley
                                                            United States District Judge

25